**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------- X
                       :

**ALBERT JULIANO,**
                       :

            **Plaintiff,**   :

                       :

      - against -      :

                       :

**MICHAEL J. ASTRUE, Commissioner**  :
**of Social Security,**

                       :

           **Defendant.**  :
------------------------------------------------------- X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**OPINION AND ORDER**

**11 Civ. 1859 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___4/12/12___

## I.  INTRODUCTION

        Albert Juliano, represented by counsel, brings this action pursuant to the Social Security Act (the "Act"),[1] seeking judicial review of a final decision by the Commissioner of Social Security (the "Commissioner") denying his claim for disability insurance benefits ("DIB").

        Juliano argues that the Administrative Law Judge ("ALJ") erred and misapplied the applicable regulations by: 1) failing to consider the combined effects of his impairments, including pain; 2) failing to follow the treating physician rule; 3) inaccurately evaluating his credibility; 4) erroneously evaluating the testimony of the vocational witness and posing hypothetical questions that

---

[1]     *See* 42 U.S.C. § 405(g).

-1-

failed to reflect all of his limitations; and 5) failing to do a function-by-function analysis of his impairments and inaccurately evaluating his residual functional capacity ("RFC").  Juliano requests a finding that he is entitled to DIB, or in the alternative, a remand of his case for further administrative proceedings.[2]  He also requests an award of attorneys' fees pursuant to the Equal Access to Justice Act.[3]  The Commissioner has cross-moved for judgment on the pleadings, arguing that the ALJ's finding that Juliano was not disabled and, therefore, not entitled to DIB during the period under review is supported by substantial evidence and should be affirmed.  For the following reasons, the Commissioner's motion is granted, the decision denying benefits is affirmed, and the case is dismissed.

## II.   FACTUAL BACKGROUND

### A.   Procedural History

The evidence, which is contained in the administrative record, has been summarized by the ALJ in his decision denying DIB.[4]  I will recount only those facts pertinent to this motion.  On November 28, 2006, Juliano filed an

---

[2]     *See* Complaint ("Compl.") at 4.

[3]     *See* 28 U.S.C. § 2412(d)(1)(A).

[4]     *See* Transcript of the Administrative Record ("Tr."), filed as part of the Commissioner's Answer pursuant to 42 U.S.C. § 405(g), at 13-19.

application for DIB, alleging disability beginning on November 17, 2003.[5]

Juliano's application was initially denied on April 11, 2007.[6]  Juliano requested a

hearing before an ALJ[7] which took place on September 11, 2008, where Juliano

was represented by an attorney.[8]  On April 1, 2009, the ALJ found that Juliano was

not disabled.[9]  Juliano requested review of the ALJ's decision by the Appeals

Council.[10]  That request was denied on February 3, 2011.[11]

## B.    The Administrative Record

The administrative record consists of non-medical evidence, medical

evidence, and vocational expert testimony.

### 1.    Non-Medical Evidence

Juliano, who is forty-one years old, was thirty-three at the alleged

onset of his disability on November 17, 2003.[12]  He received a degree in police

---

[5]    *See id.* at 104-106.

[6]    *See id.* at 68-75.

[7]    *See id.* at 76-77.

[8]    *See id.* at 21-63.

[9]    *See id.* at 8-20.

[10]    *See id.* at 6-7.

[11]    *See id.* at 1-5.

[12]    *See id.* at 23.

science in 1993.[13]  Beginning in 1995, and through the alleged onset date, Juliano was a police officer, most recently in the Port Chester Police Department.[14]  Prior to becoming a police officer, Juliano held several jobs in the construction industry and as a security guard.[15]

In 1999, Juliano was injured while arresting a suspect.[16]  He returned to work after surgery and was reinjured in 2003 in the course of active police duty.[17]  His most recent injuries included a ruptured disc in his neck, a spinal infection, a shoulder injury that required additional surgery in 2004, a bone growth in his neck, and carpal tunnel syndrome.[18]  At his hearing, Juliano claimed that his injuries prevent him from sitting or standing for more than a few hours at a time[19] and his pain medication affects his concentration, rendering him unable to focus for long periods of time.[20]  Further, Juliano complained of difficulty writing due to

---

[13]     *See id.*

[14]     *See id.* at 156.

[15]     *See id.*

[16]     *See id.* at 159.

[17]     *See id.*

[18]     *See id.* at 124-131.

[19]     *See id*. at 45-47.

[20]     *See id*. at 36.

numbness in his right hand and the inability to lift heavy objects.[21]  Juliano testified

that he lives in a house with his wife and nine-month old child.[22]   Juliano did not

report any problems with personal care, such as showering and dressing himself.[23]

In describing his daily activities, Juliano stated that he prepared small meals for

himself, drove locally, cared for his nine-month-old daughter, helped with the

laundry, watched television, and took quarter-mile walks to the end of his

driveway.[24]   Juliano noted that the longest car trip he had taken in the past year

was driving fifty minutes each way to visit family in Connecticut.[25]   Juliano

testified that he was capable of fastening buttons and zippers, tying his shoelaces,

picking up coins from a table, write "a little bit"[26], and unscrew caps, although if it

was on tight, would use his left hand.[27]   He noted that he could only use a

computer in limited durations of about ten minutes before he felt pain.  Further,

Juliano stated that many things exacerbated his pain, including sleeping the wrong

---

[21]     *See id.* at 125.

[22]     *See id.* at 28, 132-133.

[23]     *See id.* at 133-135.

[24]     *See id*. at 33-38.

[25]     *See id.* at 28.

[26]     *Id*. at 41.

[27]     *See id.* at 40-42.

way or sneezing too hard, and that these incidents would lead to pain that lasted two or three days at a time.[28]   Moreover, Juliano testified that he had difficulty sleeping and sitting and standing for long stretches.[29]

### 2.   Medical Evidence

#### a.   Treating Physicians

Medical records indicate that Juliano has a cervical sprain, a degenerative spondylosis cervical spine, post-traumatic impingement syndrome in his right shoulder, a rotator cuff tear in his right shoulder, and subacromial decompression.[30]   These impairments have led several doctors to advise Juliano not to return to police work.[31]   Juliano was first examined by Dr. Richard Freeman, an orthopedic examiner/consultant, on February 4, 2004.[32]   Dr. Freeman noted that Juliano had reported some improvement following physical therapy and acupuncture.   In light of Juliano's past surgery and current complaints, Dr. Freeman described Juliano's prognosis as guarded.[33]   On August 9, 2004, Juliano

---

[28]     *See id.* at 51, 53.

[29]     *See id*. at 39-40.

[30]     *See id*. at 13.

[31]     *See id*. at 15-16.

[32]     *See id.* at 281.

[33]     *See id*. at 282.

returned to Dr. Freeman for a follow-up examination.  Dr. Freeman noted that there had been no significant changes since his last examination and that Juliano continued to perform "light work-outs" at a gym four times a week, using a treadmill, exercise ball, and various machines.[34]  The examination showed no sensory deficits, swelling, deformity or atrophy of the right shoulder, and Juliano's reflexes in his upper extremities remained equal and active.[35]  Dr. Freeman recommended a continued course of treatment of physical therapy and acupuncture.[36]

Dr. Gregory Garner, a treating Chiropractor, treated Juliano on August 11, 2004.   He found that Juliano was extremely limited in the use of his upper extremities and that he experienced both exacerbations of pain as well as chronic pain.[37]  Dr. Garner opined that Juliano would be unable to return to work as a police officer.[38]

On March 29, 2006, Dr. Maryanne Wysell, Juliano's treating orthopedist, examined him for complaints of neck pain and stiffness, as well as

---

[34]     *See id.* at 275.

[35]     *See id.* at 276.

[36]     *See id.*

[37]     *See id.* at 270.

[38]     *See id.* at 271.

headaches.  Dr. Wysell noted that Juliano also complained of occasional knee, ankle and lower back stiffness, and that he took over-the-counter medications such as Advil and Tylenol PM to alleviate the pain.[39]  Dr. Wysell stated that Juliano's muscle strength was full (5/5) throughout, but that he was "a little weaker" in his right arm.[40]  Juliano was diagnosed with a cervical spasm and was prescribed Mobic.[41]  Zoloft, an antidepressant, was suggested for his headaches and muscle spasms.[42]  Juliano returned to Dr. Wysell on April 26, 2007.[43]  Dr. Wysell stated that Juliano was "doing much better," that the Mobic helped Juliano's fibromyalgia-like symptoms, and that he was feeling "quite well."[44]

 Dr. Wysell next examined Juliano on December 23, 2008.[45]  Her report indicated that Juliano "feels quite well," and that he was "doing very well on

---

[39] *See id.* at 283.

[40] *See id.*

[41] Mobic is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints) and rheumatoid arthritis (arthritis caused by swelling of the lining of the joints). http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000173/.

[42] *See* Tr. at 283.

[43] *See id.* at 350.

[44] *Id.*

[45] *See id.* at 353.

Neurontin up to 1200 mg a day, and Mobic 15 mg a day."[46]  Additionally, Dr. Wysell noted that Juliano could always take a higher dose of Neurontin if his neck was really bothering him, and that she would suggest possibly adding Cymbalta. For now, however, Juliano "seems pretty well controlled."[47]

Juliano continues to experience pain from these injuries and takes medication to manage this pain.[48]  During a July 2007 examination with Dr. Samuel Kozner, Juliano's treating neurologist, Dr. Kozner noted that all of Juliano's neurological and mental status examinations were normal and that, with the help of the medication Neurontin, Juliano was tolerating the pain.[49]  Two separate independent orthopedic examinations by revealed medical findings consistent with the functional capacity to meet the primary strength demands of sedentary work.[50]

### b.    Consulting Physicians

On March 28, 2005, Juliano visited Dr. Robert Roffman for an

---

[46]     *Id.*

[47]     *Id.*

[48]     *See id.* at 16-18.

[49]     *See id.* at 16.

[50]     *See id.* at 15-16.

orthopedic consultation in connection with his Workers' Compensation claim.[51]

Dr. Roffman opined that Juliano was capable of working as a police officer

provided that he was not: required to use his right upper extremity at or above the

shoulder level; lift, push, or pull more than ten to fifteen pounds; and put in a

position where he may have to use a firearm or physically restrain a suspect.[52]  Dr.

Roffman also noted that Juliano's reflexes were symmetric and that there was no

right-hand motor or sensory deficit.[53]  Dr. Roffman diagnosed Juliano with cervical

sprain/strain, pre-existing degenerative spondylosis of the cervical spine, remote

C6-C7 fusion, post-traumatic impingement syndrome of the right shoulder, right

rotator cuff tear, status post-rotator cuff repair, and subacromial decompression.[54]

Dr. Roffman recommended that Juliano continue his home exercise program.[55]

On March 27, 2007, Dr. Thomas Li, a consulting physician, examined

Juliano.  Juliano complained of right shoulder and neck pain with lifting, pulling

and pushing, and he showed slightly reduced motor strength on his right side.[56]  Dr.

---

[51]     *See id.* at 265-267.

[52]     *See id.* at 267.

[53]     *See id.* 266-267.

[54]     *See id.* at 267.

[55]     *See id.*

[56]     *See id.*

Li observed no muscle atrophy and no sensory or reflex abnormality.[57]  Dr. Li

noted that Juliano's stance was normal, that he did not use an assistive device, and

required no assistance getting on and off the exam table.[58]  Dr. Li stated that

Juliano's prognosis was stable.[59]  He opined that Juliano had moderate limitations

in prolonged and repetitive lifting and carrying, especially when reaching with his

right upper extremity, and some limitation with repetitive neck motion.[60]

### c.    New Evidence Submitted to the Appeals Board

The ALJ made his determination denying Juliano disability benefits

on April 1, 2009.[61]  Following this decision, Juliano submitted new evidence to the

Appeals Council.   Upon review, the Appeals Council determined that the new

evidence did not warrant remand or provide a basis for changing the ALJ's

decision.

The new submissions included an evaluation provided by Juliano's

chiropractor, Dr. Garner, dated May 20, 2009.[62]  However, the form provided by

---

[57]    *See id.* at 319.

[58]    *See id*. at 318.

[59]    *See id.* at 319.

[60]    *See id*. at 320.

[61]    *See id.* at 20.

[62]    *See id.* at 355.

Dr. Garner stated that he last treated Juliano in March 2006.  He diagnosed Juliano with cervical disc injury, cervical radicular syndrome, and cervicalgia.[63]  When asked to identify positive objective signs of Juliano's pain, he checked boxes for sensory loss, tenderness, muscle atrophy, reflex changes, muscle weakness, muscle spasm and significant loss of motion.[64]  Dr. Garner opined that Juliano could sit for a total of two hours in an eight-hour work day, stand and walk for a total of one hour each, and could lift up to twenty five pounds occasionally.[65]

Next, Juliano submitted a report from Dr. Wysell, who examined him on July 16, 2009, more than three months after the ALJ's decision.  Dr. Wysell's report noted that Juliano's most recent MRI, performed a week earlier, did "not show anything really significant . . . ."[66]  Dr. Wysell reported that although the Neurontin helped, Juliano could not tolerate higher doses.[67]  Instead, she prescribed Cymbalta.  On a follow-up visit,  Dr. Wysell stated that Juliano presented with cervical spasm, mild fibromyalgia and carpal tunnel.[68]  Dr. Wysell gave Juliano

---

[63]     *See id.*

[64]     *See id.* at 359.

[65]     *See id.* at 356.

[66]     *Id.* at 390-391.

[67]     *See id.*

[68]     *See id.* at 380.

wrist splints to use at night.[69]   On February 22, 2010, Dr. Wysell completed a

work capacity evaluation form for Juliano.  It was noted that Juliano's medication

Mobic had caused gastrointestinal upset and fatigue, and that Neurontin had caused

"rage" problems when the dosage was increased.[70]  Dr. Wysell opined that Juliano

could not sit, stand or walk for a single hour in an eight-hour work day, and could

never lift any weight whatsoever.[71]

### 3. Vocational Expert Testimony

Donald Slive, a vocational expert ("VE"), testified at Juliano's

September 11, 2008, hearing.[72]  The VE testified that Juliano's past work involved

very heavy physical demands and skills such as the ability to conduct

investigations, write reports, interact with the public, enforce laws and regulations,

and detect and prevent crime.[73]  The VE stated that a hypothetical individual of the

same age, education, and work history, limited to sedentary work with the ability to

lift ten pounds occasionally and with no ability to reach behind with his right arm,

could not perform his previous work as a police officer.  However, this

---

[69]     *See id.*

[70]     *See id.* at 364.

[71]     *See id.*

[72]     *See id*. at 56.

[73]     *See id.* at 57.

hypothetical person could perform several jobs existing in the national economy, including that of a skip tracer, investigator, and protective signal operator.[74]  The VE indicated that the jobs identified existed in significant numbers in the local and national economies.[75]

### C.    The ALJ's Decision and Analysis

At step one of his analysis, the ALJ determined that Juliano had met the Act's insured status requirements through December 31, 2009, and that he had not engaged in substantial gainful activity since November 7, 2003.[76]  Next, at the second step, the ALJ found that Juliano had the following severe impairments, which caused more than minimal limitations to his ability to perform work-related activities: "vertebrogenic (e.g. cervical) sprain/strain; degenerative spondylosis cervical spine; post traumatic impingement syndrome right shoulder; rotator cuff tear, right shoulder; status post rotator cuff repair and subacromial decompression."[77]  At step three, the ALJ determined that Juliano did not have an impairment or combination of impairments that meets or medically equals one of

---

[74]    *See id.* at 58.

[75]    *See id.*

[76]    *See id.* at 13.

[77]    *Id.*

the listed impairments.  The ALJ concluded that the listed impairment

requirements had not been met because there was "no documentation of any motor,

sensory or reflex deficits as requied under medical listing 1.04A.  There has also

been no evidence to ambulate or to do fine/gross movements effectively within the

context of medical listing 1.02."[78]

At step four, the ALJ found that plaintiff had the RFC to perform a

range of sedentary work,[79] with the following limitations:

> his ability to engage [substantial gainful work activity] has
> been compromised by impairment-caused manipulative
> limitations referable to inability to use his dominant, right
> upper extremity above shoulder level (e.g., to reach
> upwards or behind, or handle) or lift, push or pull more
> than 10 pounds.

While acknowledging that Juliano could not perform his past relevant work, the

ALJ determined that "although the claimant's additional limitations do not allow

the claimant to perform the 'full range' . . . of sedentary work, considering his age,

---

[78]    *Id*. at 16.

[79]    Sedentary work is the least rigorous of the five categories of work
which include "very heavy, heavy, medium, light, and sedentary." 20 C.F.R. §
404.1567.  Generally, sedentary work involves "up to two hours of standing or
walking and six hours of sitting in an eight-hour work day." *Curry v. Apfel*, 209
F.3d 117, 122 (2d Cir. 2000).  "Sedentary work also involves 'lifting no more than
10 pounds at a time and occasionally lifting or carrying articles like docket files,
ledgers, and small tools.'" *Id.* (quoting 20 C.F.R. § 404.1567(a)).

education and transferable work skills, a finding of 'not disabled' is appropriate."[80]

In making his determination, the ALJ noted that Juliano's testimony "shows that he is quite active with regard to his activities of daily living and is not as functionally compromised as alleged."[81]  He noted the wide range of Juliano's activities, finding that "such a level of activity is not consistent with contentions of total disability."[82]  He noted that the opinions of both treating and consulting physicians were consistent with a finding that Juliano could engage in sedentary work.[83]  The ALJ did not accord much weight to Juliano's testimony about the intensity, persistence, and limiting effects of his symptoms, finding it "not credible to the extent it was inconsistent with the above residual functional capacity assessment."[84]  Because the ALJ determined that Juliano could not perform his past relevant work, he continued on to step five.  Based on his review of the record, the ALJ found that Juliano retained the functional capacity to perform sedentary work considering his age, education, and transferable work skills.[85]  The ALJ cited

---

[80]    *Id*. (citations omitted).

[81]    *Id*. at 17.

[82]    *Id*. at 18.

[83]    S*ee id.* at 17.

[84]    *Id.* at 18.

[85]    *See id.* at 19.

to the examples the VE gave for jobs that someone with Juliano's limitations could

perform including investigator, skip tracer and protective-signal operator.  Based

on his analysis of the record, the ALJ found that Juliano was "not disabled" as

defined by the Act.[86]

## III.   LEGAL STANDARD

### A.   Substantial Evidence Standard

In reviewing an ALJ's decision in a disability benefits case, a district

court does not conduct a *de novo* review of the ALJ's decision.[87]  The ALJ must set

forth the crucial factors supporting his decision with sufficient specificity,[88] but a

district court must not disturb the ALJ's decision if "correct legal standards were

applied" and "substantial evidence supports the decision."[89]  "Substantial evidence

is 'more than a scintilla.  It means such relevant evidence as a reasonable mind

---

[86]     *See id.*

[87]     *See Petrie v. Astrue*, 412 Fed. App'x 401, 403-04 (2d Cir. 2011).
*Accord Brickhouse v. Astrue,* 331 Fed. App'x 875, 876 (2d Cir. 2009); *Halloran v.
Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).

[88]     *See Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  *See also
Ramos v. Barnhart,* No. 02 Civ. 3127, 2003 WL 21032012, at *6 (S.D.N.Y. May 6,
2003).

[89]     *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). *See also* 42
U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any
fact, if supported by substantial evidence, shall be conclusive.").  *Accord Halloran*,
362 F.3d at 31.

might accept as adequate to support a conclusion.'"[90]

"'To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'"[91]  Even if there is substantial evidence for the claimant's position, the Commissioner's decision must be affirmed when substantial evidence exists to support it.[92]  Moreover, the Commissioner's findings of fact, as well as the inferences and conclusions drawn from those findings, are conclusive even in cases where a reviewing court's independent analysis of the evidence might differ from the Commissioner's analysis.[93]

## B.     Five-Step Process

Pursuant to the Act, the Social Security Administration ("SSA") has

---

[90]     *Burgess v. Astrue,* 537 F.3d 117, 127-28 (2d Cir. 2008) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). *Accord Halloran*, 362 F.3d at 31; *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

[91]     *Tarsia v. Astrue*, 418 Fed. App'x 16, 17 (2d Cir. 2011) (quoting *Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir. 1999)).

[92]     *See Davila-Marrero v. Apfel,* 4 Fed. App'x 45, 46 (2d Cir. 2001) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.") (quoting *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)).  *Accord Morillo v. Apfel*, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001).

[93]     *See Hartwell v. Barnhart*, 153 Fed. App'x 42, 43 (2d Cir. 2005).

established a five-step sequential process to determine whether a claimant is disabled.[94]  At step one, the ALJ must decide whether the claimant is engaging in substantial gainful work activity ("SGA").[95]  Generally, if the claimant has earnings from employment above a certain level, he is presumed to be able to engage in SGA and is deemed not disabled.[96]  If the claimant is not engaging in SGA, the analysis continues.

At step two, the ALJ must determine whether the claimant has a medically determinable impairment(s), or a combination thereof, that is "severe."[97] According to the Regulations, an impairment or combination of impairments is "severe" if it significantly limits the claimant's ability to perform basic work-related activities.[98]  An impairment is "not severe" when the evidence establishes only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the claimant's ability to work.[99]  If the claimant has a severe impairment or combination thereof, the analysis must proceed.

---

[94]     *See* 20 C.F.R. § 404.1520(a).

[95]     *See id.* § 404.1520(a)(4)(I).

[96]     *See id.* § 404.1520(b).

[97]     *Id.* §§ 404.1520(a)(4)(h), (c).

[98]     *Id.* § 404.1520(c).

[99]     *Id.* § 404.1521.

At step three, the ALJ determines whether the claimant's impairment or combination thereof meets or medically equals the criteria of a listed impairment.[100]  If the impairment is contained in the Listings, the claimant is considered disabled.[101]  If not, the analysis continues.

At step four, the ALJ must first determine the claimant's RFC,[102] which is his ability to complete work-related activities on a sustained basis despite the limitations resulting from his impairments.  In making this finding, the ALJ must consider all of the claimant's impairments, including any non-severe impairments.[103]  Then, the ALJ must determine whether the claimant has the RFC to perform any relevant work that the claimant has done in the past.[104]  If the claimant is unable to do any past relevant work, the analysis proceeds.

At the last step of the evaluation, step five, the ALJ must determine

---

[100]    *See id.* § 404, subpart P, Appendix 1 (hereinafter the "Listings" or "Listing of Impairments").  The Listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just substantial gainful activity. *See id.* § 404.1525(a) (the purpose of the Listings is to describe impairments "severe enough to prevent an individual from doing any gainful activity").

[101]    *See id.* § 404.1520(d).

[102]    *See id.* § 404.1520(e).

[103]    *See id.*

[104]    *See id.* § 404.1520(f).

whether the claimant's RFC, age, education and work experience allow him to perform any other work in the national economy.[105]  If so, the claimant is not disabled.  But if he is unable to do other work, the claimant is disabled.  Although the claimant generally continues to have the burden of proving disability, a limited burden of production shifts to the Commissioner at this step.  To support a finding that the claimant is not disabled at this step, the Commissioner must provide evidence demonstrating that other work exists in significant numbers in the national economy that the claimant can perform, given his RFC, age, education and work experience.[106]

### C.    The "Treating Physician" Rule

Under the "treating physician" rule, "the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence."[107] When a treating physician's opinion is not given controlling weight, the

---

[105]    *See id.* § 404.1520(g).

[106]    *See id.* §§ 404.1520(g), 404.1560(c).

[107]    *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).  *See also* 20 C.F.R. § 404.1527(d)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.").

regulations require the ALJ to consider several factors in determining how much weight it should receive. These factors include: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist.[108] After considering the above factors, the ALJ must "'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'"[109] Failure to provide "'good reasons for not crediting the opinion of a claimant's treating physician'" is a ground for remand.[110]

## IV. DISCUSSION

### A. Sufficiency of the ALJ's Consideration of the Combined Effect of Juliano's Impairments

Juliano argues that the ALJ erred as a matter of law in failing to

---

[108]    *See* 20 C.F.R. § 404.1527(d)(2).

[109]    *Newbury v. Astrue*, 321 Fed. App'x 16, 17 (2d Cir. 2009) (quoting *Halloran*, 362 F.3d at 33). *See also* 20 C.F.R. § 404.1527(d)(2) (stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion").

[110]    *Newbury*, 321 Fed. App'x at 17 (quoting *Snell*, 177 F.3d at 133). *Accord Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reason' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

consider the combined effects of his impairments, including pain.[111]  Under the

five-step process required by the SSA, at step two the ALJ must determine whether

"the claimant has . . . a combination of impairments that is 'severe.'"[112]  At this

step, if the ALJ does not find a combination of severe impairments, the analysis

does not proceed.

Here, the ALJ found that Juliano did suffer from a combination of

impairments that were severe.[113]  He reviewed all the medical evidence in

combination and discussed the development of Juliano's medical condition in

detail.[114]  Furthermore, the ALJ listed all of Juliano's impairments and specifically

discussed his experience with pain and his need for pain medication.[115]  The ALJ's

decision demonstrates that he considered all of Juliano's impairments in

combination and, indeed, found this combination of impairments to be severe for

the purpose of the second step of the five-step process.

Additionally, Juliano argues that the ALJ failed to explain why his

impairments did not meet or equal in severity an impairment found in the Listing

---

[111]    *See* Compl. ¶ 15(a).

[112]    *See* 20 C.F.R. § 404.1520(c).

[113]    *See* Tr. at 13.

[114]    *See id*. at 13-18.

[115]    *See id*.

of Impairments analyzed in the third step of the five-step process.  However, the ALJ explicitly stated his reasons for this finding, stating "[s]pecifically, there is no documentation of any motor, sensory, or reflex deficits as required under medical listing 1.04A.  There has also been no evidence of an inability to ambulate or to do fine/gross movements effectively within the context of medical listing 1.02."[116] This analysis, which is consistent with the medical evidence summarized by the ALJ as well as Juliano's testimony that he can go for walks and perform movements such as closing buttons and unscrewing bottle caps,[117] sufficiently sets forth the grounds in support of this finding.

### B.   The ALJ's Treatment of the Treating Physician's Opinion

Juliano argues that the ALJ erred in failing "to give controlling weight to the opinion of Plaintiff's treating physician regarding the nature and extent of Plaintiff's impairments . . . and failing to consider whether to give significant weight to the opinion of Plaintiff's treating physician as to the nature and extent of Plaintiff's impairments."[118]   However, there is no evidence that the ALJ disregarded the opinion of any of  Juliano's treating physicians such as Dr. Wysell,

---

[116]   *Id*. at 16.

[117]   *See id*. at 17.

[118]   Compl. ¶¶ 15(d)-(e).

-24-

Dr. Freeman or Dr. Garner. While the ALJ credited the opinions of two consulting physicians – Dr. Roffman and Dr. Li – who reported a functional assessment consistent with the primary strength demands of sedentary work, he additionally reviewed all reports from multiple treating physicians.[119] Nothing in these reports conflicted with the RFC assessment of the consulting physicians. The ALJ fully credited the opinion of Juliano's treating physicians who found him incapable of performing past relevant work.[120] Juliano argues that the opinion of Dr. Garner should have been given controlling weight.[121] However, the ALJ fully credited Dr. Garner's opinion, which held that Juliano was disabled from performing police work and was extremely limited in his use of "his entire upper right extremity."[122] Additionally, although Juliano urges this Court to accept Dr. Wysell's opinion, in part, because it is supported by Dr. Roffman, Dr. Roffman found that Juliano was able to work as long as he was not required to use his right upper extremity.[123]

---

[119]     *See* Tr. at 13-16.

[120]     *See id*.

[121]     *See* Plaintiff's Memorandum of Law in Support of the Motion for Judgment on the Pleadings ("Pl. Mem.")  at 16.

[122]     Tr. at 270.

[123]     *See id.* at 15.  *See also* Pl. Mem. at 15.

This is consistent with the RFC considered by the VE.[124]  There is no evidence in the record that the ALJ disregarded the opinion of any treating physician.

Next, Juliano argues that the ALJ failed to fully credit Dr. Wysell's February 2010 assessment, which was submitted nearly one year after the ALJ's decision.  The Appeals Council determined that the assessment was not contrary to the weight of the evidence currently on the record.[125]  The Commissioner argues that this assessment does not relate to the examinations Dr. Wysell performed during the relevant time period.  Instead, this assessment pertains to a July 2009 examination conducted months after the ALJ's determination. This appears to be accurate.  In the reports submitted during the relevant time period, Dr. Wysell noted that Juliano was doing well on Neurontin and Mobic.  Only after the ALJ's determination did Dr. Wysell report that an increased dosage of Neurontin was causing "rage" problems.[126]  Further, none of Dr. Wysell's three reports during the relevant time period described the level of severity or complete disability that Dr. Wysell determined to be the case in her 2010 assessment.  Moreover, no other physicians observed symptoms such as rage, fatigue, weakness, and loss of

---

[124]    *See id.* at 19.

[125]    *See id.* at 1.

[126]    *See id*. at 364.

attention and concentration, as noted in Dr. Wysell's 2010 assessment.  Even if this assessment were to relate to the period at issue, newly submitted evidence does not warrant remand, provided that it "does not add so much as to make the ALJ's decision contrary to the weight of the evidence."[127]   Although it is evident that Juliano experiences pain due to his injuries, the ALJ's determination that he was not totally disabled during the relevant time period is supported by the record.

Lastly, Juliano argues that the ALJ was required to more fully develop the record.  "Where there are no obvious gaps in the administrative record and the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to re-contact a physician.[128]   Here, there were no obvious gaps in the record.  Because there was substantial evidence in the record on which the ALJ based his determination, the ALJ was under no further obligation to develop the record.

### C.    Sufficiency of the ALJ's Evaluation of Juliano's Credibility

Juliano argues that the ALJ erred in evaluating his credibility.[129]   An ALJ is permitted to consider an individual's activity level in making a

---

[127]    *Rutkowski v. Astrue*, 368 Fed. App'x 226, 229 (2d Cir. 2010).

[128]    *Rosa v. Callahan*, 168 F.3d 72, 79, n.5 (2d Cir. 1999) (quoting *Perez*, 77 F.3d at 48).

[129]    *See* Compl. ¶ 15(h)(1).

determination of credibility.[130]  The ALJ will consider all of the medical and

nonmedical information in determining credibility.[131]

       In this case, the ALJ properly considered plaintiff's ability to take

walks, drive, cook, shower, groom and dress himself, and care for his nine-month-

old daughter.[132]  The ALJ identified the basis for his finding on credibility and

stated that Juliano "is not as functionally compromised as alleged."[133]  Because the

ALJ cited a list of Juliano's regular activities that contradict his claims of extreme

pain and inability to perform sedentary work,[134] and personally observed Juliano in

an upright seated position for a significant period of time,[135] the ALJ properly

determined that Juliano's subjective complaints were not fully credible and

---

[130]    Because credibility is a question of fact, the Commissioner has discretion to determine whether or not a claimant's subjective complaints are credible. *See Staubley v. Electric Boat Co.*, No. 10-3186-AG, 2011 WL 3849556, at *2 n.2 (2d Cir. 2011) (citing *McLaughlin v. Secretary of Health, Educ. & Welfare*, 612 F.2d 701, 705 (2d Cir. 1980)); *Lopez v. Astrue*, No. 08 Civ. 480, 2009 WL 790099, at *6 (S.D.N.Y. Mar. 25, 2011).

[131]    *See* 20 C.F.R. § 404.1529(c)(4). *See also Rosado v. Shalala*, 868 F. Supp. 471, 472-73 (E.D.N.Y. 1994) (stating that an ALJ may rely on a claimant's activities of daily living as substantial evidence in support of his determination).

[132]    *See* Tr. at 17-18.

[133]    *Id*. at 17.

[134]    *See id*. at 17-18.

[135]    *See id*. at 18.

sufficiently set forth the grounds in support of this finding.

### D.      Sufficiency of the ALJ's Residual Functional Capacity Finding

Juliano argues that the ALJ erred in failing to do a function-by-function analysis of his impairments and that the ALJ's evaluation of his RFC was flawed.[136]  While the Second Circuit has not specifically addressed the requirement of a function-by-function assessment,[137] other circuits have held that while a function-by-function analysis is desirable, the ALJ's written opinion need not discuss each function, especially those functions for which no limitation is alleged.[138]  Within the Southern District of New York, courts have reached different conclusions as to whether a function-by-function analysis is required or merely desirable.[139]

---

[136]      *See* Compl. ¶ 15(h)(2).  The Complaint contains two paragraphs marked 15(h).  For purposes of clarity, I will refer to the first as ¶ 15(h)(1) and the second as ¶ 15(h)(2).

[137]      *See Wood v. Commissioner of Soc. Sec.*, No. 06 Civ. 157, 2009 WL 1362971, at *6 (N.D.N.Y. May 14, 2009).

[138]      *See Delgado v. Commissioner of Soc. Sec.*, 30 Fed. App'x 542, 547-48 (6th Cir. 2002); *Bencivengo v. Commissioner of Soc. Sec.*, 251 F.3d 153 (Table) (3d Cir. 2000).

[139]      *See, e.g., Novak v. Astrue*, No. 07 Civ. 8435, 2008 WL 2882638, at *3 (S.D.N.Y. July 25, 2008) ("Although the Second Circuit has not specifically addressed this question, several courts . . . have held that the function-by-function requirement of SSR 96-8p does not apply to the A.L.J."); *Casino-Ortiz v. Astrue*, No. 06 Civ. 155, 2007 WL 2745704, at *13 (S.D.N.Y. Sept. 21, 2007) ("'Although

Here, the ALJ specifically addressed most of Juliano's functions. He noted that "there was a moderate limitation in prolonged and repetitive lifting, carrying, reaching high, reaching back with the right upper extremity" and "limitations in repetitive range of motion of the neck."[140]  In addition, the ALJ noted that he "carefully observed the claimant during the course of the hearing as appearing to be quite comfortable in a seated position without any observable difficulties."[141]  The ALJ discussed all of the evidence in detail – including the results of MRIs, physician evaluations, and Juliano's testimony regarding his regular level of activity – before concluding that although Juliano is "unable to perform any past relevant work," he is capable of "exerting up to 10 pounds of force occasionally" and can "lift, carry, push, pull, or otherwise move objects, including the human body."[142]  The ALJ's RFC determination requires no further detail.

a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce [ ] a detailed statement in writing.'") (quoting *Burrows v. Barnhart*, No. 03 Civ. 342, 2007 WL 708627, at *13 (D.Conn. Feb. 20, 2007) (quotation marks and citations omitted)). Compare with *Murphy v. Barnhart*, No. 00 Civ. 9621, 2003 WL 470572, at *9 (S.D.N.Y. Jan. 21, 2003) ("Under the regulations, the ALJ also must analyze a claimant's RFC on a function-by-function basis.").

[140]    Tr. at 16.

[141]    *Id*. at 18.

[142]    *Id*. at 17.

### E.    Sufficiency of the ALJ's Evaluation of the Vocational Witness

Juliano argues that the ALJ erred in evaluating the testimony of the VE and posed hypothetical questions which did not reflect all of Juliano's limitations.[143]  In support of this claim, Juliano argues that the ALJ's hypothetical question to the vocational expert described Juliano's impairment as causing "some" limitation in reaching.[144]  This is an inaccurate description of the ALJ's question.  A review of the transcript shows that his hypothetical description actually stated, "[n]o overhead reaching with the right arm.  No reaching behind him with the right arm."[145]  This description accurately characterizes Juliano's limitations and is consistent with the medical evidence.

The ALJ credited the testimony of the VE about the jobs which Juliano could perform and their existence in the national economy.[146]  The ALJ found no conflict between the jobs identified by the VE and the descriptions in the Dictionary of Occupational Titles.[147]  Pursuant to SSR 00-4p, the ALJ's decision to rely on the testimony of the VE was reasonable.

---

[143]    *See* Compl. ¶¶ 15(i)-(j).

[144]    *See* Pl. Mem. at 23.

[145]    *See* Tr. at 57.

[146]    *See id*. at 18-19.

[147]    *See id*. at 19.

## V.    CONCLUSION

For the reasons stated above, Juliano's Complaint is dismissed, his request for attorneys' fees is denied, the Commissioner's cross-motion is granted, and the Commissioner's decision finding that Juliano is not disabled is affirmed. The Clerk of the Court is directed to close these motions [Docket Nos. 9 and 11] and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          April 12, 2012

-32-

**-Appearances-**

**For Plaintiff:**

Irving M. Portnoy, Esq.
Irving M. Portnoy and Associates, P.C.
542 Union Avenue
New Windsor, New York 12553
(845) 567-0315

**For Defendant:**

John E. Gura, Jr.
Assistant United States Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2712